**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Oray Fifer,<br><br>        Plaintiff,<br><br>v.<br><br>United States of America,<br><br>        Defendant. | No. CV-12-01753-PHX-NVW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On August 16, 2012, plaintiff Oray Fifer filed a suit against the United States that the Court construed as alleging federal corrections officers committed a battery when they shot him with a rubber pellet gun amid a 2010 prison riot at the Federal Correctional Institution in Phoenix, Arizona ("FCI Phoenix"), where he was an inmate. Such an action against the United States for damages lies under the Federal Tort Claims Act ("FTCA"). After a three-day trial, the Court makes the following findings of fact and states the following conclusions of law pursuant to Rule 52(a)(1).

**I.  FINDINGS OF FACT**

    **A. Evidence at Trial**

On September 3, 2010, Fifer was an inmate at FCI Phoenix. At the time, Fifer lived in unit "Navajo A," a triangular cell block with a large common area in the center. The unit featured two floors of cells that altogether housed about 120 inmates. Fifer was assigned to a cell on the second floor. In addition to bunk beds and bathroom fixtures,

each cell contained desks with removable chairs and lockers with removable padlocks. Interior stairwells connected the two floors, and a railing made of metal piping bordered the edge of the upstairs hallway. This formed a balcony overlooking the "dayroom," the central common area surrounded by the cell blocks. One corner of Navajo A also included a "crossover" hallway, sealed on both ends with secure doors that connected the unit with other wings of the prison.

At approximately 5:00 PM that day, a racially-charged riot broke out between groups of Latino and African-American inmates in Navajo A. Fifer, an African-American, noticed the first signs of a disturbance from inside his cell, where he observed several Latino inmates standing in a line in the hallway. After leaving his cell to investigate, Fifer headed downstairs and stood near a TV on the dayroom perimeter. There he heard another inmate rush by and shout that an African-American inmate was being attacked. Fifer walked toward the stairs and saw a group of Latino inmates rush past him. He went back up to his cell, locked his locker to secure his belongings, and put on his boots to protect himself from the incident unfolding.

Fifer then peered out of his cell and witnessed events escalate. He watched inmates congregate by race and attack each other in groups. Projectiles flew across Navajo A in multiple directions, everything from splintered mop handles and homemade "shanks" (improvised sharp weapons) to chairs and a mop bucket. At one point someone hurled a microwave over the second-floor balcony. A photograph depicting the aftermath shows scattered objects throughout the dayroom floor and a vandalized computer terminal previously available for inmates to use to check their email. Several witnesses recalled seeing blood and teeth on the ground.

At this point Fifer observed a significant number of white and Latino inmates gathering down the hall from his cell. Fifer had recently learned of racially motivated violence against African-Americans at other prisons throughout the country and believed this could be something along the same lines. Uneasy at being the only black inmate on the second floor, Fifer decided to go downstairs rather than stay in his cell, characterizing

the latter option as a "death trap" given his inability to lock the cell from the inside. Fifer ran back downstairs to roughly the same spot he had been before. From there he watched groups of inmates continue to fight and throw objects at one another. Fifer was never observed throwing anything, attacking anyone, or using any object as a weapon.

Just before this unfolded, Corrections Office Justin Fletcher had entered a first-floor administrative office inside Navajo A with a window looking out into the dayroom. As he looked through the office window, he witnessed several inmates suddenly attack another inmate with a padlock wrapped in a sock, striking the individual on the head numerous times. Fletcher immediately called for backup and ordered the inmates to get on the ground and stop fighting. The inmates did not comply. As the uproar escalated, Fletcher repeated his calls for backup and eventually fled the office fearing for his personal safety.

A backup team of about ten prison security officers soon arrived led by Lieutenant Thomas Peterson. Upon arrival, Peterson listened through the door leading to the Navajo A unit and determined the events on the other side to be chaotic. Outside the door two officers stood over an inmate who was sitting on the ground, his face covered in blood. After briefly observing the events from afar, Peterson and his staff determined that the unfolding riot was likely serious enough to require non-lethal force if inmates would not comply with verbal orders. Accordingly Peterson called for an arsenal of non-lethal riot-control weapons, though he and his team did not have time to obtain body armor or other defensive gear. The items that arrived included the following: L-8 "stinger-ball" grenade launchers, which fire exploding rubber balls filled with small rubber pellets; "pepper-ball" launchers, which fire small projectile balls filled with chemical irritants; and "flash-bang" grenades, which generate high-intensity light and sound for a short period of time upon detonation.

As a first step to regain control of Navajo A, Peterson opened the door to the dayroom just long enough to throw a flash-bang grenade inside, and then quickly shut the door. Fifer heard the device explode, which caused the inmates in the dayroom to scatter.

1  Fifer, too, ran for a stairwell and attempted to go back upstairs for fear that officers would
2  soon arrive and discipline those remaining in the dayroom.  He opted not to duck into a
3  cell on the first floor given the risk of inflaming more racial tension by entering a cell
4  occupied by members of another race.  However, impaired vision in his right eye, dating
5  back to an accident several years prior, required him to look down at his feet to avoid
6  tripping.  That impairment significantly slowed his pace.

As Fifer slowly made his way up the stairs, Peterson and his team rushed in and began yelling orders.  The evidence at trial was mixed as to what orders were given and when:

- Fifer himself testified that officers ordered inmates first to get to their cells, then to get down on the ground.  According to him, there were several different officers calling out different orders, apparently at the same time.
- Fletcher testified at trial that upon entering Navajo A, he ordered inmates to get on the ground or stop fighting.  In an affidavit submitted just after the incident in 2012, Fletcher said the same thing but added that at least one officer also ordered inmates to go back to their cells.  (Doc. 73 at 22.)
- Lieutenant Kevin Schuster, one of the other officers present at the scene, initially testified at trial that both he and the other officers directed inmates only to get down on the ground.  However, Schuster also submitted a 2012 affidavit in which he stated that upon entering Navajo A, his team encountered two groups of inmates.  According to that affidavit, he and the other officers ordered the first group "to lay on the ground or get in their cells."  (Doc. 73 at 31.)  The affidavit stated that this group complied, but that upon encountering a second group still fighting, he and the officers likewise instructed them "to lie down or get in a cell."  (Doc. 73 at 31.)
- Peterson, however, testified that the inmates were given two different sets of orders at two distinct points in time.  According to his testimony, upon entering Navajo A, he and his team immediately instructed the inmates to get down on

- 4 -

the ground or to get to cells. No one fired weapons at any specific inmates upon issuing these initial instructions. Most inmates had either dropped to the ground or holed up in cells soon after the orders were issued. However, some inmates still remained out in the open. To address this, Peterson testified that he and his team switched tactics, ordering those inmates only to get on the ground. Like Schuster and Fletcher, however, Peterson also submitted an affidavit in 2012. This affidavit tells it differently. According to his affidavit, Peterson and his team initially ordered inmates "to get on the ground in English and Spanish saying to lie on their stomach with their hands behind their back and to cover their heads." (Doc. 73 at 26.) After an initial group of inmates complied with these orders, the officers moved farther into Navajo A and encountered inmates fighting and throwing objects at each other. In his affidavit, Peterson states that "these inmates were told to lie down or get in a cell." (Doc. 73 at 27.)

As Fifer ascended the stairs back up to the second floor, Peterson and a number of officers continued deploying various non-lethal weapons to quell the riot. According to Peterson, he and his staff did so only to the extent needed to regain control of the inmate population. However, they did not have time to deliberate over specific instances of weapon deployment given the rapid pace of events. Peterson testified that while he and his staff deployed some items intended to subdue all inmates at once, such as the flash-bang grenade and pepper-balls, they also sought to quell the chaos by targeting individual inmates. According to Peterson, part of the staff's protocol was to use non-lethal force on inmates who appeared to be contributing to the ongoing unrest, or who failed to comply with orders tailored toward this end.

At this moment Peterson observed Fifer ascending the staircase. Having already given one order to get down, Peterson tracked Fifer and shouted a general order to get to the ground, though Peterson did not mention Fifer specifically, either by name or by description, nor did Fifer make eye contact with Peterson or otherwise acknowledge that

1  he heard the command. Fifer continued running along the second floor. Unsure of
2  Fifer's intentions (another stairwell across the upstairs hallways could have enabled Fifer
3  to return to the dayroom floor), Peterson made a decision to fire his L8 stinger-ball
4  grenade launcher at Fifer in order to halt his progress. Fifer and one fellow inmate,
5  Johnnie Mosley, Jr., who testified on Fifer's behalf at trial, insisted that Fifer was on the
6  ground on his hands and knees prior to being shot. Peterson, as well as Terrill Thomas,
7  another inmate who testified for Fifer, maintained that Fifer was still on his feet and
8  running toward his cell. In any event, Peterson fired the L8. (Fifer has consistently
9  maintained that Schuster was the one who shot him, but Peterson admitted to having done
10 so both in his 2012 affidavit and in his testimony at trial. Schuster has consistently
11 denied having ever fired at Fifer.) The L8 had a range of about 75 feet. Peterson testified
12 he was approximately 50 feet from Fifer when he fired the weapon.

13 Peterson testified that he followed then-current protocol and aimed at Fifer's
14 midsection, neither above nor below. (The prison's protocol has since changed requiring
15 officers to aim for the legs.) Peterson, who at the time was standing below on the first
16 floor, also maintained that his position required him to aim upward as he shot at Fifer
17 because aiming any lower would have caused the second-floor railing to obstruct his fire.
18 The stinger-ball grenades he fired were designed to burst and release rubber pellets
19 spreading across a radius the distance of about five people. Neither party could
20 definitively say how the projectiles traveled, i.e., whether they traveled only through the
21 air or first bounced off the wall or floor before hitting Fifer. In the end, however, several
22 rubber pellets struck Fifer. According to Fifer, something hit him in the back of the head
23 as he was still ascending the staircase, then in the back of the hand once he got to the top.
24 While along the upper tier, Fifer noticed rubber pellets bouncing off the wall at a rapid
25 clip. One hit him in the neck, one in his left eye, and possibly another on his head. The
26 impact knocked him temporarily unconscious.

27 Fifer soon woke up on his bed, having been dragged into his cell by his cellmate,
28 who had observed him on the ground out in the hallway. Fifer's left eye, previously

1  healthy and functional, now had no vision and was filled with blood. As Schuster
2  conducted checks of all the cells following the riot, he observed Fifer's condition and
3  spoke with him briefly. According to Fifer, Schuster told Fifer he should have been
4  running faster. According to Schuster, he told Fifer that he got shot because he was not
5  following directions.

6  As a result of the incident, a number of inmates were moved into "segregated
7  housing units" pending investigation. Most of those individuals were then transferred to
8  other prisons. Fifer was one such inmate. Prison officials moved him out of FCI Phoenix
9  following the riot and transferred him to a federal corrections facility in Talledega,
10 Alabama. However, while a number of inmates received discipline after a review board
11 found they were actively involved in the riot, no prison official ever determined Fifer
12 played an active role. Fifer received no discipline for the riot.

13 A medical evaluation revealed that Fifer suffered a detached retina, contusion, and
14 permanent scarring in his left eye resulting in partial blindness. Because of the previous
15 injury to his right eye, the new injuries left Fifer unable to see out of both eyes. The
16 prison paid for him to receive three surgeries on his left eye and two on his right eye.
17 The vision in his right eye returned, but the vision in his left eye remains impaired.

18 **B. Resolving Mixed Evidence**

19 The parties presented mixed evidence as to several facts material to the outcome
20 of this case. The Court's express findings as to those facts are as follows.

21 First, Peterson, not Schuster, shot Fifer. Peterson himself admitted this in his
22 testimony at trial. Additionally, Peterson intended to hit Fifer with the L8. However, he
23 did so with no intention of hitting Fifer in the head. Peterson followed protocol and
24 aimed for Fifer's midsection, driven only by the desire to quell the riot.

25 Second, Fifer was on his feet running at the time Peterson observed him, shouted
26 to get to the ground, and fired the L8 at him. Fifer himself offered mixed, ambiguous,
27 and confusing testimony about when exactly he went to the ground. Witness Johnnie
28 Mosley, Jr., who also testified that Fifer was on the ground when shot, provided

contradictory testimony at various points and conceded that he only observed the entire course of events from his narrow cell window that would have necessarily limited his view. By contrast, Peterson testified that he would not have fired at Fifer on the ground for the (very sensible) reason that the railing lining the second floor would have obstructed the shot. Terrill Thomas—one of Fifer's own witnesses—independently corroborated Peterson's story that Fifer was running when shot. Fifer was on his feet running when Peterson shot him.

Third, Peterson did not intentionally target Fifer's head and face. He aimed for Fifer's midsection in accordance with the department's protocol at the time, an assertion consistent with his affidavit statement that he "aimed very low in [Fifer's] direction." (Doc. 73 at 27.) He was also constrained by the height of the second-floor railing and his low angle relative to Fifer, which forced him to aim upward. Peterson made a good-faith effort to aim below Fifer's neck.

Fourth, prison officers ordered inmates both to get to the ground and to get to cells. While Fletcher and Schuster testified that they only ordered inmates to the ground, their affidavits, as well as the testimony and affidavits of Peterson, indicate that whatever orders they themselves were giving, other officers were also ordering inmates to get into cells. It is not clear from the evidence whether inmates were instructed to get into their *own* cells or into *any* cell. But however phrased, Fifer could have reasonably taken it to mean either and did take it to mean to return to his cell. Effectively, then, in the course of the melee Fifer was ordered to go to the ground, to go to a cell, and to go to his cell.

Fifth, the Court must make a difficult determination as to when precisely Fifer was given which orders. While many witnesses testified (or stated in their affidavits) that both instructions were given, only Peterson spoke to the sequence in which they were given. However, his affidavit and his trial testimony diverge. Between his trial testimony, given five years later and his affidavit taken less than two years after the events, Peterson's affidavit is closer in time and more persuasive. The Court therefore finds that upon entering Navajo A, Peterson and his team initially ordered inmates to the

ground only and then ordered those inmates still up and moving to get to the ground or get into cells. Those two instructions were given simultaneously at least until the time Fifer was shot.

## II. LEGAL STANDARDS AND BURDEN OF PROOF

The federal government is immune from suit for damages absent an express waiver of sovereign immunity by Congress. The FTCA is one such waiver. *See Fang v. United States*, 140 F.3d 1238, 1241 (9th Cir. 1998). Fifer's complaint against the government was for unconstitutional excessive force, for which there is no cause of action and which would be barred by sovereign immunity anyway. The Court generously treated this as a claim for battery under the Federal Tort Claims Act. *See* Doc. 63 at 2; Doc. 72 at 4-5.

The FTCA provides, "The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances" for certain tort claims. 28 U.S.C. § 2674. Specifically, the United States may be sued "under circumstances where local law would make a private person liable in tort." *United States v. Olson*, 546 U.S. 43, 44 (2005) (emphasis and internal quotation marks omitted). The FTCA provides that plaintiffs may bring claims of "assault [and] battery" for "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680. *See Millbrook v. United States*, 569 U.S. 50 (2013) (holding FTCA extends to intentional torts committed by law enforcement officials where alleged conduct "arise[s] within the scope of their employment").

Fifer has alleged that federal corrections officers shot him with rubber pellets at FCI Phoenix. Thus the "local law" at issue is Arizona law.

But it is a bit more complicated what that local law of Arizona is. At its core, the law of battery protects against intentional "harmful or offensive contact with the person of another." Restatement (Second) of Torts § 13(a) (1965). *Accord Johnson v. Pankratz,* 196 Ariz. 621, 623, 2 P.3d 1266, 1268 (Ct. App. 2000). It does not end there. As the Restatement instructs,

> liability is defeated by any privilege available to the defendant . . . . In particular, the plaintiff's consent to the contact with his person will prevent the liability. The absence of such consent is inherent in the very idea of . . . battery. . . . Therefore, the absence of consent is a matter essential to the cause of action, and . . . it must be proved by the plaintiff as a necessary part of his case.

Restatement (Second) of Torts § 13(a) (1965) cmt d. By this path, battery became an early regulation of medical practice, which always involves the body. The inquiry becomes the scope of the patient's consent, not the bodily invasion, which is a given. *Duncan v. Scottsdale Medical Imaging, Ltd.*, 205 Ariz. 306, 309, 70 P.3d 435, 438 (2003).

"A privilege may be based upon . . . the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise . . . ." Restatement (Second) of Torts § 10(2)(b) (1965). Plainly, a corrections officer quelling a prison riot already turned violent has a "privilege" to use harmful contact. The claim then turns on whether the extent of the battery was "necessary" to that purpose. In this Court's view, for a prisoner in such circumstances to prove common law battery, or even to state a claim, he must prove more than just an intentional and harmful touching. He must also allege and prove that the extent of the harmful touching exceeded the "privilege," that is, exceeded what was "necessary" for the lawful purpose of quelling a violent prison riot. The inquiry becomes the reasonable necessity of the degree of harmful touching in the actual circumstances of this riot, not the harmful touching, which is also a given. The inquiry about reasonable necessity looks very much like a negligence analysis.

Arizona has not just relied on the foregoing common law analysis to protect corrections officers from suit and liability for mere harmful touching of prisoners in riots. Arizona legislation restates and improves upon the common law by two steps. First is section 13-403(2) of the Arizona Revised Statutes, which establishes a justification defense to any criminal charge as follows:

- 10 -

> The use of physical force upon another person which would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances:
>
> . . .
>
> (2) A superintendent or other entrusted official of a jail, prison or correctional institution may use physical force for the preservation of peace, to maintain order or discipline, or to prevent the commission of any felony or misdemeanor.

Second is section 13-413, which extends the criminal justification to a prohibition of civil liability: "No person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter." A.R.S. § 13-413. Prison officials thus have "the statutory right to use that amount of physical force necessary to maintain order within the prison." *State v. Bojorquez*, 138 Ariz. 495, 498, 675 P.2d 1314, 1317 (1984). The United States and its officers in whose place it stands are not liable if their actions fell within the protection of section 13-403(2).

The text of section 13-413 is not written in the language of a defense to liability. This Court believed that sections 13-403(2) and 13-413 together, especially section 13-413, added a new element to the Arizona cause of action for battery by a prisoner against a corrections officer, beyond the oft-quoted common law elements in general, which themselves omit the element of non-consent.

When this Court originally granted summary judgment against Fifer, it did so on the basis that Fifer's collection of details, without discussion or refutation of the circumstances of danger and urgency the officers confronted, did not amount to a *prima facie* showing that the officers' use of force went beyond maintaining order in the chaotic and violent riot situation. (Doc. 78 at 1 ("[T]here is no evidence of battery under Arizona law.").) The Court of Appeals reversed, stating, "Under Arizona law, an actor commits battery "if the actor [1] intentionally [2] engages in an act [3] that results in [4] harmful or offensive contact with the person of another." (Doc. 88-1 at 2-3.) By omission from

that sentence, the Court of Appeals necessarily concluded that sections 13-403(2) and 13-413 do not legislate a new element for a prisoner's cause of action for battery against a corrections officer.

Were this Court writing on a clean slate, it would hold that sections 13-403(2) and 13-413 do not establish an affirmative defense to be proved by the corrections officer. Rather, they establish an additional element that the prisoner must plead as inapplicable and must prove (by disproving reasonableness) at trial.[1]  Were it otherwise, a prisoner could always sue his jailers and proceed to discovery by pleading intentional touching without more.

But the slate is not clean.  The mandate of the Court of Appeals gives this Court express direction that sections 13-403(2) and 13-413 establish an affirmative defense that the Government must prove.  The court stated, "The question is whether the government has established its affirmative defense that its force against Fifer was justified as a matter of law under Arizona Revised Statutes § 13-403(2)."  (Doc. 88-1 at 3.)  The Arizona courts may interpret these statutes differently.  But that is law of the case here.  By force of the mandate, this Court finds the burden of proof is on the Government to prove applicability of sections 13-403(2) and 13-413 to defeat liability.

This Court elaborates on allocation of burden of proof because some of the findings of fact made above are determined by burden of proof.  In this case that burden matters.

---

[1] Taking section 13-413 at face value as not requiring the corrections officer to prove the reasonable necessity of the force used would maintain the parallel with the identical criminal defense of section 13-403(2) of the Arizona Revised Statutes.  The criminal statutes on justification look more like defenses.  But at the time these statutes were enacted in the 1970s, once a criminal defendant raised an affirmative defense, the State bore the burden of disproving it beyond a reasonable doubt.  *See, e.g.*, *State v. Duarte*, 165 Ariz. 230, 231, 798 P.2d 368, 369 (1990) ("[O]nce evidence of self-defense is presented, the burden is on the state to prove beyond a reasonable doubt that the conduct was unjustified.").  It should be no surprise that the Legislature also meant for the prisoner-plaintiff to prove the corrections officer's use of force was excessive and unreasonable when suing the officer personally—not for the officer to have to prove his actions reasonable.

### III. CONCLUSIONS OF LAW

By the standards that govern this case, Peterson committed a battery: He intentionally shot Fifer with an L8, injuring his eye and knocking him unconscious. Because Fifer has met his burden of proving battery, the case turns on whether the government has adequately proved Peterson's use of force was necessary "for the preservation of peace, to maintain order or discipline, or to prevent the commission of any felony or misdemeanor." *See* A.R.S. § 13-403(2). On the facts previously found, it has not.

At trial the government made much of Fifer's own actions and choices, framing the injuries he suffered as lamentable but ultimately his own fault. However, even if Fifer unreasonably exposed himself and failed to protect himself in the course of the riot, that would not allow prison officials to exceed reasonably necessary force in restoring order. This case turns on whether the force used against Fifer exceeded what was necessary to quell the riot, not whether he was partly at fault. *See Strawberry Water Co. v. Paulsen*, 220 Ariz. 401, 409-10, 207 P.3d 654, 662-63 (Ct. App. 2008) (declining to permit victim's conduct to factor into liability of intentional tortfeasor). *Cf. Alabam Freight Lines v. Phoenix Bakery, Inc.*, 64 Ariz. 101, 111, 166 P.2d 816, 822 (1946) ("In an action to recover damages for an assault and battery it would be illogical and absurd to allow as a defense proof that the plaintiff did not use proper care to avert the blow."), *overruled on other grounds by Anderson v. Morgan*, 73 Ariz. 344, 347, 241 P.2d 786, 788 (1952).

Fifer's actions, like anyone else's actions in the riot, could affect the amount of force needed to quell it. For example, if the applicable law permitted prison officials to use "reasonable" force, an inmate's dangerous actions could be precisely what make a responding officer's use of force reasonable. Here, however, the applicable law is section 13-403(2) of the Arizona Revised Statutes, which permits officials to use force "for the preservation of peace, to maintain order or discipline, or to prevent the commission of any felony or misdemeanor." A.R.S. § 13-403(2). The Arizona courts have interpreted

this to mean that the force used must be "necessary to maintain order within the prison." *Bojorquez*, 138 Ariz. at 498, 675 P.2d at 1317.  The analysis must focus not on Fifer but on Peterson and his staff.  The motivation of their actions must have been "for the preservation of peace, to maintain order or discipline, or to prevent the commission of any felony or misdemeanor."  And the force they used must have been "necessary to maintain order within the prison."

Peterson's motive was to restore order and to prevent loss of life.  The more difficult question is whether this *necessitated* firing the L8 at Fifer.  Fifer engaged in no violence, did not damage any property, and otherwise did nothing to foment unrest.  However, by being present in the dayroom as events unfolded, he did contribute to the disorder (if unintentionally).  Because he was still running as the officers attempted to clear the dayroom, order could not be fully restored until he stopped.  Deploying the L8, in this general sense and at the moment of deployment, was required to maintain order.  But it only became required because of the officers' diverse orders.  Peterson and his staff first ordered inmates to the ground, then simultaneously ordered them both to the ground and into cells.  The government did not establish that Fifer ever defied an order because he fairly interpreted the orders as directing him to do either, and he was going to his cell.

The government must persuade by a preponderance of the evidence that the force Peterson used was justified.  (Doc. 88-1 at 3.)  The government has not carried that burden.  In the end, firing at Fifer for running to his cell was not justified where some officers ordered inmates to do just that.  There is nothing wrong with the divergent orders the officers and their colleagues were shouting.  Both orders could have restored safety, whichever one an inmate followed.  But those orders themselves, which all the officers gave or heard, limited the bounds of need for force.  In the circumstances and of the facts found herein, shooting at Fifer fell short of necessity.

/ / /

/ / /

The United States is liable to Plaintiff Oray Fifer for battery under the Federal Tort Claims Act.

Dated: July 28, 2017.

_____
Neil V. Wake
Senior United States District Judge